IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                            No. CR 21-0521 JB

ARTURO ARCHULETA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objections to the Draft Presentence Investigation Report, filed September 28, 2023 (Doc. 76)("Objections"). The primary issue is whether the Presentence Investigation Report, filed November 3, 2023 (Doc. 79)("PSR"), incorrectly calculates Defendant Arturo Archuleta's base offense level pursuant to § 2T1.1(a)(1) of the United States Sentencing Guideline Manual (U.S. Sent'g Comm'n 2023)("U.S.S.G."), because Archuleta's amended tax returns establish that his tax loss was less than $100,000.00, which results in a base offense level of 13. The Court overrules Archuleta's objection to the PSR's base offense level calculation, because the Court concludes that Archuleta's tax loss for the purposes of determining Archuleta's base offense level is greater than $100,000.00.

## FACTUAL AND PROCEDURAL BACKGROUND

From at approximately 2013 to 2018, ABQ Injury Clinic, LLC employed Archuleta as an independent contractor. See PSR ¶¶ 10-12, at 5-6; Second Superseding Indictment ¶ 2, at 1, filed June 15, 2022 (Doc. 35)("Indictment"). During this time, Archuleta derived $291,241.50 in income from his role at ABQ Injury Clinic, which Archuleta did not report to the Internal Revenue Service ("IRS"). See Plea Agreement ¶¶ 9, 14, at 4, 6, filed May 16, 2023 (Doc. 66)("Plea

Agreement"). In addition to this income, Archuleta diverted checks made out to ABQ Injury Clinic through a separate bank account that Archuleta maintained in his name, and subsequently retained a portion of the checks for his personal gain. See Plea Agreement ¶ 9, at 5; PSR ¶¶ 10-11, at 5-6. An IRS investigation determined that Archuleta "stole 709 checks from different insurance companies or patients' lawyers that were made out to ABQ Injury Clinic," which "amounted to $552,844.81 in additional income that Archuleta failed to report to the IRS." PSR ¶ 15, at 6. See id. ¶ 24, at 8. Had he correctly reported his total income at the end of each year between 2013 and 2018, the PSR calculates that Archuleta would have been required to pay a total of $234,350.00 in taxes. See PSR ¶ 25, at 8. The Albuquerque Police Department ("APD") arrested Archuleta on July 30, 2018, in Albuquerque, New Mexico, and charged Archuleta "with five counts of Embezzlement . . . and seven counts of Theft of Identity." PSR ¶ 13, at 6. Archuleta "entered into a plea agreement, . . . and was convicted of two counts of Embezzlement, and one count of Theft of Identity." PSR ¶ 13, at 6. In March, 2020, after Archuleta's attorney received notice from the IRS that Archuleta was under criminal investigation for tax evasion, Archuleta filed late tax returns for the years in which he did not pay taxes. See Plea Agreement at 4 n.2.

On June 15, 2022, a Grand Jury indicted Archuleta on five counts of Attempt to Evade and Defeat Tax in violation of 26 U.S.C. § 7201, and for a sixth count alleging False Statements Relating to Health Care Matters in violation of 18 U.S.C. §§ 1035(a)(2) and 2. See Indictment at 1-6. Archuleta entered a guilty plea to the Indictment's counts one through five on May 16, 2023. See Plea Agreement at 3-4. On March 27, 2023, Archuleta filed amended tax returns for years 2014 through 2018 that provide a new calculation of the amount of taxes Archuleta owes. See PSR ¶ 26, at 8; Response to Defendant's Objections to Draft Presentence Investigation Report, filed October 23, 2023 (Doc. 77)("Response"); Amended U.S. Individual Income Tax Return at 5,

filed February 3, 2024 (Doc. 84-3).  As of March 28, 2023, Archuleta had an outstanding "Tax Due" amount of $99,057.00.  Summary of Tax Due Per Corrected Forms 1040-X (dated March 28, 2023), filed February 3, 2024 (Doc. 84-3)("Tax Due Summary").  In addition, Archuleta "made a payment of $20,000 towards his taxes owed for the 2014 tax year on June 12, 2023."  PSR ¶ 30, at 9.

On November 3, 2023, the United States Probation Office ("USPO") filed the PSR.  See PSR at 1; Memorandum at 1, filed November 3, 2023 (Doc. 80)("USPO Memo.")(explaining that the USPO revises the original Presentence Investigation Report, filed August 8, 2023 (Doc. 71), "to include corrections, updated financial information provided by the defendant, and updated tax liability provided by the assigned case agent").  The PSR groups Archuleta's five tax-evasion counts for the purpose of calculating Archuleta's base offense level, "because [the counts] involve the same victim and the same act or transaction."  PSR ¶ 34, at 10 (citing U.S.S.G. § 3D1.2(a)).  In addition, the PSR counts the amount of taxes Archuleta should have paid for 2013 for the purposes of calculating Archuleta's base offense level under U.S.S.G. § 1B1.3.  See PSR ¶ 22, at 8.  The PSR establishes that Archuleta's base offense level is 16, because the "tax loss is more than $100,000 from § 2T4.1 Tax Table."  PSR ¶ 35, at 10 (citing U.S.S.G. § 2T1.1(a)(1)).  Taking into account a 2-level enhancement to Archuleta's base offense level pursuant to U.S.S.G. § 2T1.1(b)(1), because Archuleta "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity," PSR ¶ 36, at 10, and a 3-level decrease to Archuleta's base offense level for his acceptance of responsibility and assistance to authorities, see PSR ¶¶ 42-43, at 10-11, the PSR calculates Archuleta's total offense level at 15, see PSR ¶ 44, at 11.  With an offense level of 15 and a criminal history category of III, the PSR calculates Archuleta's Guideline imprisonment range at 24 to 30 months.  See PSR ¶ 110, at 26.

In his Objections, Archuleta argues that his base offense level "is no greater than 13," because his "amended returns indicate that his tax due was less than $100,000." Objections at 1. While Archuleta acknowledges "that *payments* made of taxes owed do not reduce the tax loss," he asserts that "the Government is incorrect that *amended* returns filed after a defendant becomes aware of a tax investigation may not be considered." Defendant's Sentencing Memorandum at 6, filed February 3, 2024 (Doc. 84)("Archuleta Memo.")(emphasis in original). See id. at 6 ("Amended returns do not constitute any payment toward taxes owed, but rather provide a more accurate reflection of what taxes are in fact owed." (citing United States v. Hoskins, 654 F.3d 1086 (10th Cir. 2011)). Archuleta argues that the Court should conclude, therefore, that his outstanding tax due and owing following the acceptance of his amended tax returns is a "'reasonable estimate' of the tax loss." Archuleta Memo. at 4 (quoting U.S.S.G. §2T1.1 cmt. n.1).

The United States responds that the Court should not permit Archuleta "to conflate the tax due and owing for purposes of restitution with the 'tax loss' to be considered for purposes of calculating the appropriate sentencing guideline range in this case." Response at 2 (no citation given for quotation). The United States argues that "[t]he guideline is crystal clear that '[t]he tax loss is not reduced by any payment of the tax subsequent to the commission of the offense.'" United States' Sentencing Memorandum at 10, filed January 26, 2024 (Doc. 83)("United States Memo.")(quoting U.S.S.G. § 2T1.1(c)(5))(second alteration in the Response). According to the United States, "this calculation avoids 'the perverse result of allowing any criminal to nullify much of the burden of his crime simply by paying the tax liability once the IRS had begun to audit or investigate.'" United States Memo at 10 (quoting United States v. Tandon, 111 F.3d 482, 490 (6th Cir. 1997)).

## LAW REGARDING CALCULATION OF TAX LOSS

U.S.S.G. § 2T1.1 defines "tax loss" for the purposes of sentencing defendants charged with tax evasion under 26 U.S.C. § 7201 as "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1). See United States v. Hoskins, 654 F.3d at 1092. Section 2T1.1 further instructs courts that tax loss "shall be treated as equal to 28% of the unreported gross income . . . , unless a more accurate determination of the tax loss can be made." U.S.S.G. § 2T1.1, cmt. n.1. "[A]lthough the government bears the burden at sentencing of proving the amount of tax loss flowing from the defendant's illegal acts, neither the government nor the court has an obligation to calculate the tax loss with certainty or precision." United States v. Sullivan, 255 F.3d 1256, 1263 (10th Cir. 2001). See United States v. Tilga, 824 F. Supp. 2d 1295, 1311 (D.N.M. 2011)(Browning, J.). Moreover, a district court may "group[] the counts against" the defendant, and "calculate her offense level based upon 'the aggregated quantity' of the tax loss." United States v. Thompson, 518 F.3d 832, 867 (10th Cir. 2008)(quoting U.S.S.G. § 3D1.3(b)). "Once the total tax loss attributable to a defendant has been calculated, the defendant's base offense level is determined from the table contained in § 2T4.1." United States v. Meek, 998 F.2d 776, 781 (10th Cir. 1993).

"The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." U.S.S.G. § 2T1.1(c)(5). See United States v. Mathis, 980 F.2d 496, 497 (8th Cir. 1992)("Payment of the taxes the Mathises attempted to evade does not alter the tax loss or offense level under the guidelines."); United States v. Jones, 459 F. App'x 379, 388 (5th Cir. 2012)("[N]one of the corporate-return payments should be credited as they were subsequent to the commission of the tax-evasion offense. . . . [T]hat the corporate return was filed, and payments made on it, after Jones learned in 2002 that he was being audited by the IRS further support this

result . . . ."). Accordingly, "the Sentencing Guidelines define 'tax loss' under 26 U.S.C. § 7201 as the intended loss and not the actual loss." United States v. Vernon, 814 F.3d 1091, 1107 (10th Cir. 2016)(quoting U.S.S.G. § 2T1.1(c)(1)). This proposition means that "the *attempted* or *intended* loss, rather than the *actual* loss to the government, is the proper basis of the tax-loss figure." United States v. Chavin, 316 F.3d 666, 677 (7th Cir. 2002)(emphasis in original). See United States v. Delfino, 510 F.3d 468, 473 (4th Cir. 2007)("This unpaid tax represents the intended loss to the Government.").

For example, in United States v. Tandon, upon learning "that he would be audited," the defendant "filed an amended tax return" reporting additional income that he had previously failed to report. 111 F.3d at 486. The defendant subsequently "was convicted on three counts of willfully filing false personal income tax returns." 111 F.3d at 487. On appeal, the United States Court of Appeals for the Sixth Circuit rejected the defendant's argument "that the district court erred in computing the 'tax loss' to be used in calculating the 'base offense level' because it did not reduce the amount of the loss by the additional amounts he paid the IRS." 111 F.3d at 490. In arriving at this holding, the Sixth Circuit rejected the contention that the "tax loss should be calculated to include only the actual loss to the government," and that the defendant's "theory would lead to the perverse result of allowing any criminal to nullify much of the burden of his crime simply by paying the tax liability once the IRS had begun to audit or investigate." 111 F.3d 490. See United States v. Vernon, 814 F.3d 1107 (rejecting the defendant's argument that taxes for which she "ultimately paid" improperly were "included in the loss calculation," because "the fact that Vernon was ultimately forced to pay those back taxes . . . is irrelevant").

The Guidelines provide, however, that the general proposition that tax loss be based off the amount a defendant intended to withhold and not the United States' actual loss does not preclude

a district court's consideration of the defendant's unclaimed deductions. See U.S.S.G. § 2T1.1, cmt. n.3. Rather, a 2013 amendment to the Guidelines permits courts to deduct from the tax loss previously unclaimed tax credits. See 1 Roger W. Haines, Jr. et al., Federal Sentencing Guidelines Handbook: Text and Analysis 1220 (2023 ed.)("Handbook"). The 2013 amendment resolved a Court of Appeals split and codified the approach that the United States Court of Appeals for the Tenth Circuit took in United States v. Hoskins, 654 F.3d 1086.[1] See Handbook at 1220-21. The guidelines now provide that, "[i]n determining tax loss, . . . the court should account for any unclaimed credit, deduction, or exemption that is needed to ensure a reasonable estimate of the tax loss," so long as the unclaimed credit, deduction, or exemption is related to the tax offense, could have been claimed at the time the tax offense was committed, and can be reasonably ascertained. U.S.S.G. § 2T1.1 cmt. n.3. In addition, the defendant must present "information" to support the credit, deduction, or exemption in advance of sentencing. U.S.S.G. § 2T1.1 cmt. n.3. Before the 2013 amendment, the Court held that under United States v. Hoskins, a defendant was entitled to claim a foreign tax credit against the amount of tax loss from her offense. See United States v. Tilga, 824 F. Supp. 2d 1295, 1320-21 (D.N.M. 2011)(Browning, J.).

---

[1]In United States v. Hoskins, the Tenth Circuit held that "the plain language of § 2T1.1 does not categorically prevent a court from considering unclaimed deductions in its sentencing analysis." 654 F.3d at 1094. The Tenth Circuit explained that "a court may exercise its discretion to consider additional evidence that could guide its findings on the losses to the government relevant to sentencing," which includes evidence of deductions the defendant could have claimed had they paid their taxes. 654 F.3d at 1095. Because "the government is not supposed to reap windfall gains as a result of tax evasion," the Tenth Circuit reasoned, "the government cannot claim to have lost revenue it never would have collected had the defendant not evaded his taxes." 654 F.3d at 1095. In a footnote, however, the Tenth Circuit emphasized that § 2T1.1 "does not permit a defendant to benefit from deductions unrelated to the offense at issue." 654 F.3d at 1095 n.9. Thus, "unclaimed deductions for student loan interest or solar energy credits, for example, are not considered because they do not relate to the 'object of the offense' and are not relevant to restitution or guideline calculations for sentencing purposes." 654 F.3d at 1095 n.9.

## ANALYSIS

Archuleta argues that the Court should calculate tax loss for the purposes of determining his base offense level on the basis of the amount of taxes he owes as reflected in his March, 2023, amended tax returns for years 2014 through 2018. See Objections at 1; Archuleta Memo. at 6. The United States maintains that the PSR's tax loss calculation is the appropriate calculation upon which to base Archuleta's base offense level. See Response at 2; United States Memo. at 9-12. The Court declines to accept Archuleta's proposed calculation of tax loss, because the Court concludes that it does not accurately state the underlying tax loss resulting from Archuleta's conduct. Regardless, even if the Court were to accept Archuleta's proposed tax loss calculation for 2014 through 2018, his base offense level would remain unchanged. Archuleta's proposed calculation of his tax loss for years 2014 through 2018 is $99,057.00. In addition to the amount of taxes Archuleta should have paid for 2013 -- $1,013.00 -- which the PSR counts for the purposes of determining Archuleta's base offense level under U.S.S.G. § 1B1.3, the total tax loss is $100,070.00. See PSR ¶ 22, at 8. Accordingly, under either proffered methodology, Archuleta's base offense level is 16 and his Guideline imprisonment range is 24 to 30 months. See U.S.S.G. § 2T4.1.

The Court concludes, nonetheless, that Archuleta's proposed calculation is not more accurate than that outlined in the PSR. The law is clear that Archuleta may not reduce his tax loss "by any payment of the tax subsequent to the commission of the offense." U.S.S.G. § 2T1.1(c)(5). According to this general proposition, therefore, any payments Archuleta made following the commission of his offense do not reduce his tax loss. See United States v. Vernon, 814 F.3d at

1107.² Archuleta's argument, however, is more nuanced: he does not argue that subsequent payments reduce his tax loss; rather, he argues that the amended tax returns he filed constitute a more accurate account of his tax loss. See Archuleta Memo. at 6. The Tenth Circuit advises that "a defendant . . . may be able to persuade a court that a revised calculation more accurately states the underlying tax loss that should be applicable to a defendant's conduct." United States v. Hoskins, 654 F.3d at 1095. As a result, in cases like Archuleta's, where the defendant has offered what he or she argues is a more accurate calculation of tax loss, "a court may exercise its discretion to consider additional evidence that could guide its findings on the losses to the government relevant to sentencing." United States v. Hoskins, 654 F.3d at 1095. Accordingly, the Court will consider Archuleta's amended returns as "additional evidence" in determining the appropriate tax loss calculation. United States v. Hoskins, 654 F.3d at 1095.

On March 27, 2023, Archuleta filed 1040-X forms amending tax returns for 2014 through 2018 that Archuleta filed late in 2020. See Plea Agreement at 4, n.2; Letter from Anthony B. Jefferies to Internal Revenue Service (dated March 27, 2023), filed February 3, 2024 (Doc. 84-3). In the 1040-X forms, Archuleta avers that he was neither an independent contractor nor an employee for Albuquerque Injury Clinic, but that he and Dr. Joseph Wilson operated the business as a partnership. See Form 1040-X, Amended U.S. Individual Income Tax Return (2014) at 5 (dated March 27, 2023), filed February 3, 2024 (Doc. 84-3)("2014 1040-X")("A partnership distribution replaced the Schedule C."); Form 8082, Notice of Inconsistent Treatment of Administrative Adjustment Request (AAR) at 14, filed February 3, 2024 (Doc. 84-3)(indicating

---

²The United States points to several "payments [Archuleta] made to the IRS toward his tax obligations within the last year" and indicates that the "Defendant may also seek to reduce the applicable tax loss by applying" these payments. United States Memo. at 9-10. Archuleta does not argue that his tax loss is reduced by these payments towards his outstanding tax obligation. See Archuleta Memo at 4-6; Objections at 1.

that a return of partnership income form was never filed despite the existence of a partnership); Response at 7 ("The government understands that . . . the Defendant seeks to argue at sentencing that ABQ Injury Clinic was a partnership by operation of law . . . ."). Accordingly, Archuleta adjusts downward the amount of income he originally reported in the returns he filed in 2020 and asserts that he should have paid a total of $99,057.00 in taxes for 2014 through 2018. See 2014 1040-X at 4. Archuleta indicates that the amended returns "have been accepted by the IRS." Archuleta Memo. at 4.

An amended return is a return that corrects information previously filed with the IRS. See Rev. Proc. 96-42, 1996-2 C.B. 306 (1996). Although there is no statute authorizing the filing of amended tax returns, "it has been the general administrative practice over a long period of time to recognize amended returns filed after the due date for the purpose of correcting clear errors or plain mistakes inhering in original returns." Klinghamer v. Brodrick, 242 F.2d 563, 564 (10th Cir. 1957). See Badaracco v. Comm'r, 464 U.S. 386, 393 (1984)("[T]he Internal Revenue Code does not explicitly provide either for a taxpayer's filing, or for the Commissioner's acceptance, of an amended return; instead, an amended return is a creature of administrative origin and grace."). The IRS has the discretion to accept or reject amended returns filed after the date for filing a return has passed. See Hillsboro Nat. Bank v. Comm'r, 460 U.S. 370, 378 n.10 (1983)("[A]cceptance of such a return after the date for filing a return is . . . within the discretion of the Commissioner."); McCabe v. Comm'r, 46 T.C.M. (CCH) 390 (T.C. 1983)("The Commissioner has discretion to accept or reject amended returns filed after the due date."). Individuals use Form 1040-X to amend a previously filed tax return. See Instructions for Form 1040-X at 2, Internal Revenue Service (revised February 2024), https://www.irs.gov/pub/irs-pdf/i1040x.pdf.

The Court concludes that Archuleta's proposed tax loss calculation does not "more accurately state[] the underlying tax loss" than does the PSR.  United States v. Hoskins, 654 F.3d at 1095.  As the United States Supreme Court has recognized,

> [a]n amended return, however accurate it ultimately may prove to be, comes with no greater guarantee of trustworthiness than any other submission. It comes carrying no special or significant imprimatur; instead, it comes from a taxpayer who already has made false statements under penalty of perjury.

Badaracco v. Comm'r, 464 U.S. at 399.  Moreover, although Archuleta argues that the IRS has "accepted" his amended returns, Archuleta Memo. at 4, he includes no evidence in support of this assertion, see Samp v. United States, No. 16-CR-20263, 2019 WL 3423317, at *4 (E.D. Mich. July 30, 2019)(Ludington, J.)(noting that the defendant "has not identified any evidence that the IRS has in fact accepted his amended returns filed in 2018 for tax years 2009, 2010, and 2011," and concluding, therefore, that the "amended return does not necessarily accurately reflect his tax loss amount").  Even if the IRS has accepted Archuleta's amended returns, Archuleta presents no evidence that the IRS has taken the further step of making an "assessment on the basis of the amended return, [or] taken that return into account by making a supplemental assessment upon the original return."  Koch v. Alexander, 561 F.2d 1115, 1117 (4th Cir. 1977).  See Miskovsky v. United States, 414 F.2d 954, 955 (3d Cir. 1969)("Plaintiff had no power to alter the government's assessment by filing an amended return almost a year later in which he undertook to reduce the tax to less than the partial payment he had made."); McCabe v. Comm'r, 46 T.C.M. (CCH) 390 (T.C. 1983)("An amended return does not, however, change an assessment that has been made or vitiate a notice of deficiency.").  Consequentially, the Court is not persuaded that Archuleta's

"revised calculation more accurately states the underlying tax loss that should be applicable to [his] conduct." United States v. Hoskins, 654 F.3d at 1095.[3]

Moreover, as noted previously, even if the Court were to accept Archuleta's calculation as a more accurate representation of his tax loss, Archuleta's base offense level would remain unchanged. "[W]hen determining a defendant's base level offense," U.S.S.G. § 1B1.3 "requires aggregation of all 'relevant conduct,'" in addition to the conduct the indictment charges. United States v. Meek, 998 F.2d at 781 (quoting U.S.S.G. § 1B1.3). Despite that the indictment does not charge Archuleta with tax evasion for the year 2013, the PSR provides that the tax loss for 2013 is $1,013.00, and the PSR includes this amount in the total tax loss calculation for determining Archuleta's base offense level. See PSR ¶ 22, at 8 ("The Second Superseding Indictment does not charge this conduct; however, pursuant to the provisions of USSG § 1B1.3 Relevant Conduct and in relation to all acts and omissions committed by Archuleta, he is accountable for his failure to report his taxable income in 2013."). Archuleta does not object to this paragraph of the PSR. See Objections at 1-4. The Court accepts the PSR's proposed tax loss for the year 2013 and concludes that it may consider this amount in determining Archuleta's base offense level, because the taxes that Archuleta did not pay in 2013 are a "part of the same course of conduct for which the defendant was convicted." United States v. Meek, 998 F.2d at 782. See U.S.S.G. § 1B1.3 cmt. backg'd ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").

---

[3]The Court recognizes that the United States intends to call witnesses and put on evidence regarding its tax loss calculation at the March 22, 2024, sentencing hearing. See United States Memo. at 11-12. Likewise, the Court will -- at the hearing -- entertain Archuleta's arguments regarding the calculation of his tax loss. Accordingly, on the basis of these arguments, the Court may reassess its conclusion that Archuleta's proposed tax loss calculation does not represent a more accurate account of the tax loss for years 2014 through 2018 for the purposes of determining Archuleta's base offense level. See U.S.S.G. 2T1.1(c)(1).

In United States v. Meek, the defendant objected to the district court's aggregation, for the purposes of calculating the total tax loss, of the defendant's tax deficiencies for years in which the defendant was not charged with tax evasion.  998 F.2d at 781.  In considering this question, the Tenth Circuit recognized that, "[f]or offenses like tax evasion," U.S.S.G. § 1B1.3's "commentary makes clear that the defendant need not have been charged or convicted of . . . related acts or omissions in order for them to qualify as relevant conduct."  998 F.2d at 781-82 (citing U.S.S.G. § 1B1.3 cmt. n.2).  District courts, the Tenth Circuit reasons, properly may consider uncharged failure to pay taxes "as long as the failure to file was part of the same course of conduct for which the defendant was convicted."  998 F.2d at 782.  The Tenth Circuit advised that the United States

> may prove that the defendant's non-charged conduct was part of the same course of conduct as the offense of conviction either directly, by establishing that this conduct was part of a continuing pattern of tax violations, or indirectly, by establishing simply that all the conduct to be aggregated constituted violations of the tax code.  In the latter situation, the government is entitled only to a rebuttable presumption that the defendant's non-charged conduct was part of the same course of conduct as the offense of conviction, and the defendant may defeat this presumption by coming forward with evidence that his non-charged conduct was clearly unrelated to his conviction.

998 F.2d at 782.  On the basis of this reasoning, the Tenth Circuit in United States v. Meek concluded that the United States "relied on the direct method of proof to establish that the defendant's non-charged conduct was part of the same course of conduct as his offense of conviction," and succeeded in "provid[ing] evidence that the defendant's failure to file tax returns for the years 1984-86 and 1989-91 was part of a continuing pattern of tax violations."  998 F.2d at 782.  Accordingly, "the defendant's failure to file tax returns in years other than 1987 and 1988 was relevant conduct which the district court properly considered in calculating the tax loss attributable to the defendant for purposes of determining his base offense level under § 2T1.1."  998 F.2d at 782.

Here too, the United States provides evidence that Archuleta's failure to pay taxes on his embezzled income in 2013 was part of a continuing pattern of tax violations that began in 2013 and concluded in 2018, when Archuleta's conduct was discovered and when the APD and IRS initiated investigations into Archuleta's diversion of funds from Albuquerque Injury Clinic. See PSR ¶¶ 9, 12, 16, 22, at 5-8; Archuleta Memo. at 1 ("His problems began in approximately 2013 . . . ."). The record establishes that the sixty-three checks that Archuleta stole and the taxes he failed to pay on this income in 2013 is not a separate tax violation "clearly unrelated to his conviction," United States v. Meek, 998 F.2d at 782; rather, Archuleta's conduct in 2013 was the beginning of a five-year pattern of diverting checks from the same source into the same bank account and continually failing to pay taxes on these diversions, see PSR ¶ 10, at 5-6; United States v. Babcock, 61 F.3d 908, *1 (8th Cir. 1995)(table opinion)(unpublished)("[T]tax deficiency occasioned by [the defendant's] failure to file a return in 1991 . . . was relevant conduct even if not specifically charged, and thus the 1991 deficiency was properly included in the calculation of the $16,266 tax loss attributable to him."). Consequentially, even if the Court were to accept Archuleta's proposed tax loss of $99,057.00 for years 2014 through 2018, taking into account the PSR's tax loss of $1,013.00 for the year 2013, the total tax loss for the purposes of determining Archuleta's base offense level would be $100,070.00. According to the table contained in U.S.S.G. § 2T4.1, therefore, Archuleta's base offense level would remain 16. Taking into account Archuleta's criminal history score of III and the additional adjustments the PSR applies, the Court concludes that Archuleta's total offense level is 15 and his guideline imprisonment range is 24 to 30 months.

**IT IS ORDERED** that Archuleta's objection to the PSR's tax loss calculation in the Defendant's Objections to the Draft Presentence Investigation Report, filed September 28, 2023 (Doc. 76), is overruled.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Taylor F. Hartstein
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Ray Twohig
Ray Twohig, P.C.
Albuquerque, New Mexico

-- and --

Alan Ellis
Law Offices of Alan Ellis
Rio Vista, California

*Attorneys for the Defendant*